Filed 1/15/16 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B259997 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA402221) |
| v. | |
| LUIS MIGUEL MATEO, | **ORDER MODIFYING OPINION** |
| Defendant and Appellant. | **[NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on January 13, 2016, and certified for partial publication, be modified as follows:

On the footnote on the title page, Disposition was inadvertently omitted from the list of sections certified for publication. The footnote is deleted and replaced with the following:

Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication only as to the Introduction, Facts, Duty to Instruct on Child Sexual Abuse Accommodation Syndrome section, and Disposition.

There is no change in the judgment.

_____

    KRIEGLER, Acting P. J.                        BAKER, J.

Filed 1/13/16 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE, | B259997 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA402221) |
| v. | |
| LUIS MIGUEL MATEO, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Richman, Judge. Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Russell A. Lehman, Deputy Attorney General, for Plaintiff and Respondent.

_____

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication only as to the Introduction, Facts, and Duty to Instruct on Child Sexual Abuse Accommodation Syndrome section.

Defendant and appellant Luis Miguel Mateo was convicted by jury of continuous sexual abuse of a child under the age of 14 (Pen. Code, § 288.5, subd. (a)),[1] based in part on expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS). In the published portion of this opinion, we hold the trial court had no sua sponte duty to give the pattern jury instruction (CALCRIM No. 1193) explaining the limited purpose of expert testimony on the CSAAS.

Defendant's first jury trial, in which expert testimony on CSAAS was not presented, resulted in a hung jury.[2] Defendant was sentenced to the middle term of 12 years in prison after the guilty verdict in the second trial.

Defendant contends the trial court used an incorrect standard when it denied his motion objecting to the prosecution's exercise of peremptory challenges to excuse four African-American jurors. He further contends that the trial court erred in failing to sua sponte instruct the jury regarding: (1) an expert witness's testimony on CSAAS; and (2) the offense of lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)) as a lesser included offense of continuous sexual abuse of a child under the age of 14. Defendant also argues he was prejudiced by ineffective assistance of counsel and cumulative error.

We affirm the judgment.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] On the prosecution's motion, the trial court dismissed three counts of lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)) during the first trial.

2

*Prosecution*

I.T. was eight years old when defendant moved into her mother's apartment, where I.T. lived with her two brothers. Defendant first sexually abused I.T. when she was nine years old. I.T. testified in detail to five specific acts of sexual intercourse with defendant, which occurred when she was between the ages of 9 and 12. I.T. also testified that defendant molested her about three or four other times in that same time period, although she did not remember specific details about those incidents.

After living with other relatives for a year when she was 17 or 18, I.T. moved into the house her mother and defendant shared in Las Vegas to reconnect with her mother. At that time, I.T.'s half sister, A.M., was 9 or 10 years old. One evening, defendant screamed at A.M. while defendant and I.T.'s mother were drinking alcohol. Upset by defendant's conduct and concerned that A.M. might be victimized by defendant, I.T. told her mother about the sexual abuse that began when she was around A.M.'s current age for the first time. I.T. moved out of the house the same day, was unable to contact her mother, and out of fear for A.M.'s safety, reported the incidents to police within a few days of the argument.

Los Angeles Police Detective Paul Bowser investigated the case. During an interview with the detective, I.T. recounted the details of four of the five specific incidents of sexual intercourse with defendant. I.T. testified consistently regarding all five specific instances of sexual abuse at the preliminary hearing and at trial.

Detective Bowser and Officer Jose Ramirez conducted a recorded interview of defendant in Las Vegas. On Detective Bowser's request, Las Vegas Metropolitan Police Detective Chad Russell conducted a video-recorded interview of defendant the next day,

which was played for the jury.[3]  Defendant was advised of his *Miranda*[4] rights and confirmed that he understood the advisement.  He knew that he was being questioned because I.T. accused him of sexually abusing her as a child.  Defendant could not recall hurting I.T.  He would sometimes "have some beers, but that didn't cause [him] to get up and go bother [I.T.] or anything."  Defendant initially denied any wrongdoing, and when the detective untruthfully suggested that DNA evidence had been collected, defendant said that they would not find anything, because he had not done anything.

The detective then suggested that maybe I.T. had taken advantage of defendant when he had been drinking and it was dark in the bedroom.  He suggested that maybe, when defendant came home tired after a long day at work and had a few beers, I.T. had climbed on top of him in the dark and put his penis inside her.  Defendant might not have realized that it was I.T. and not his wife until they had begun having sexual intercourse.  Defendant might not have come forward with this information because he feared that I.T. would get into trouble.  Detective Russell said that he had heard stories about I.T. having a lot of sexual intercourse with people and that she had been a prostitute at one point.  Defendant said that he did not remember anything happening with I.T. and he did not know that I.T. had been a prostitute.

Detective Russell continued to suggest that I.T. may have taken advantage of defendant without his knowledge when he was drunk and/or sleepy and did not realize that I.T. was not his wife.  Defendant remembered "them" getting on top of him more than two or three times, but he did not know if it was his wife or I.T.  Detective Russell said that defendant should not protect I.T.  He said that I.T. needed help, and it was her fault that defendant was being questioned.  Defendant then admitted he had awoken with I.T. on top of him with his penis inside of her more than three times, and maybe five or six times.  Defendant said he would sometimes go to bed drunk, so he could not

---

[3] Detective Russell was assisted by a Spanish interpreter.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445 (*Miranda*).

4

remember the number of times it happened. He remembered that she got on top of him and that "there was penetration." I.T. got on top of him and put his penis inside of her vagina more than once or twice when he had come home from work tired. He would not fully wake up for about five minutes, but when he did he would tell her to get off of him. She would leave, but it made her angry. Until he realized it was I.T., the intercourse felt good. Defendant then said he just remembered I.T. getting on top of him once, when she was about 11. He did not tell his wife, because she had a bad temper. Defendant did not tell the detectives about it when they initially interviewed him because they asked him whether he had abused or hurt I.T., not whether she had put his penis in her vagina while he was asleep.

The prosecution presented the testimony of clinical psychologist Jayme Jones regarding the behavior of abused children generally. Dr. Jones had not interviewed or evaluated I.T. or anyone else involved in the case.

*Defense*

I.T.'s maternal aunt and grandmother testified that when I.T. was 17 years old, she told them that she did not want her mother and defendant to be together, and intended to break up the relationship.

I.T.'s mother did not believe defendant was sexually attracted to young girls. She never observed defendant acting inappropriately with her daughters or nieces. At the time of the alleged incidents, defendant was working at three jobs and was rarely home. She never left her children in his care. She contradicted I.T.'s testimony regarding two specific instances of sexual intercourse, one occurring on Halloween and another when the family went to Knott's Berry Farm. The mother also denied seeing defendant in the bathroom with I.T. on one occasion, as testified to by I.T. When I.T. moved back in with them, she acted jealous of defendant and wanted a lot of attention from her mother. I.T.'s mother had tried to talk to I.T. about the accusations, but I.T. refused to speak with her.

5

I.T.'s cousins and her close childhood friend testified that they did not believe defendant was sexually attracted to young girls, and that he had never acted inappropriately with them. I.T.'s two female cousins testified that defendant was working with their father on the Halloween night that I.T. said defendant molested her. The family had looked at photo albums for pictures of the Halloween in question, and defendant was not in any of the photos.

## DISCUSSION

### Wheeler/Batson Motion

Defendant objected to the prosecution's exercise of peremptory challenges to excuse four African-American jurors under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). In denying defendant's motion, the trial court stated that there had not been a "systematic exclusion of African Americans." Defendant challenges the trial court's ruling on the basis that the court utilized an incorrect standard. We find no error.

#### Juror No. 3539

Juror No. 3539[5] was a fourth-year student studying fashion and merchandising. She had no significant other or children. She lived with her parents and grandmother in South Los Angeles. Juror No. 3539 had never served on a jury. The prosecutor asked her if one witness would be sufficient to convict someone of a crime beyond a reasonable doubt. Juror No. 3539 responded, "I feel there should be more than just one witness. There should be more evidence to prove that." The prosecutor then asked whether the prospective juror could convict a defendant based on the testimony of a single witness

_____

[5] Juror No. 3539 was seated as Juror No. 15, and later as Juror No. 4.

whom the juror believed to be credible.  She answered, "I think there should be more."
The prosecutor questioned both Juror No. 3539 and another juror—Juror No. 14 on the issue:

"[Prosecutor]:  If the judge says you can convict if you believe that person, or are you going to say, no, I still want more?

"Prospective Juror No. 14:  I mean, in a perfect world more would be better, but if that's --

"[Prosecutor]:  That's all you got.

"Prospective Juror No. 14:  Yeah.

"[Prosecutor]:  Can you convict, yes or no?

"Prospective Juror No. 14:  Yes.  I hope so.  Maybe.

"[Prosecutor]:  I'm not asking you to convict right now, because you haven't heard anything, right?  [¶]  Do you agree with that, Juror No. [3539]?

"Prospective Juror No. [3539]:  Yes."

The prosecutor requested that Juror No. 3539 be removed for cause, due to her feelings about convicting on the basis of a single witness's testimony.  Defense counsel noted that "she said in a perfect world she would like more, but could try."  The trial court denied the challenge.  The prosecutor exercised her third peremptory challenge to remove Juror No. 3539 from the jury.


**Juror No. 1512**


Juror No. 1512[6] was an English student and freelance writer.  She had no significant other or children.  She lived with her father and uncle in South Los Angeles.  Juror No. 1512 had never served on a jury.  The prosecutor questioned her as follows:

"[Prosecutor]:  So let's say you are presented with two different versions.  Okay?  Two sides.  Does that automatically mean there is reasonable doubt?

---

[6] Juror No. 1512 was seated as Juror No. 16, and later as Juror No. 6.

"Prospective Juror No. [1512]: I think so, yes.

"[Prosecutor]: You think so? And why is that?

"Prospective Juror No. [1512]: If I hear two stories of the same thing and both differ I'm going to be in doubts on both sides, but I make my own conclusion.

"[Prosecutor]: Do you understand that sometimes you're going to hear, you have to decide, if you're able to [work] with your fellow jurors, make a call one way or the other and you may have to decide after hearing two different sides? [¶] Can you do that? Are you prepared to do that or do you have any reservation?

"Prospective Juror No. [1512]: I don't have any reservation."


**Juror No. 9705**


Juror No. 9705[7] was a marketing coordinator in a real estate office, living in South Los Angeles. She had no significant other or children. Juror No. 9705 had served as a juror on a murder trial. The jury was unable to reach a verdict. She was in the majority, and was frustrated with the outcome of that trial. She felt that "the evidence presented really didn't support one side or the other." The prosecution questioned Juror No. 9705 regarding whether she could convict a defendant based on the credible testimony of a single witness:

"Prospective Juror No. [9705]: I almost want to say I could convict based on that one person's testimony, but part of me would feel like something was missing.

"[Prosecutor]: Okay. [¶] So, you have, is it fair to say strong reservations about that rule, that you're not comfortable with that?

"Prospective Juror No. [9705]: That's fair.

"[Prosecutor]: Is it fair that if the judge instructs that is the law would you be able to follow it or would you still --

"Prospective Juror No. [9705]: If that's the judge's rule, then I will go by it.

---

[7] Juror No. 9705 was seated as Juror No. 18, and later as Juror No. 1.

"[Prosecutor]: Would you still want more?

"Prospective Juror No. [9705]: Yes, I would."

The prosecutor requested that Juror No. 9705 be removed for cause, because she did not believe one witness's testimony would be sufficient to convict. The trial court denied the challenge. The prosecutor exercised her seventh peremptory challenge to remove Juror No. 9705 from the jury.

**Juror No. 0479**

Juror No. 0479[8] was married and lived in Compton with his wife. He had one adult child. Juror No. 0479 worked as an HVAC technician. His wife was not working at the time of the trial, but she had previously worked for the state probation department, helping prisoners get settled after release. He had previously served on one criminal jury. The man was "wrongly convicted." They "threw out the case" because "they didn't have enough evidence for the police to arrest [the defendant]." The jury did not have a chance to deliberate. When questioned by the prosecution, Juror No. 0479 clarified that he "didn't think [the defendant] was wrongly convicted. What happened, they just threw out the case, lack of evidence." Juror No. 0479 stated that he would be comfortable with the police using a ruse to obtain information from a suspect. Juror No. 0479 expressed to the court that serving on the jury would be a hardship because he would not get paid and he was the only person with a job in his household.

The prosecutor challenged Juror No. 0479 for cause on the basis of hardship. The court denied the challenge stating that it did not grant challenges for hardship.

---

[8] Juror No. 0479 was seated as Juror No. 17, and later as Juror No. 1.

**Exercise of Peremptory Challenges and the *Wheeler/Batson* Motion**

After exercising eight peremptory challenges, the prosecutor accepted the jury as constituted, which included Juror Nos. 1512 and 0479. After the defense used its ninth challenge, the prosecutor exercised her ninth peremptory challenge to remove Juror No. 0479 from the jury. She later exercised her 10th peremptory challenge to excuse Juror No. 1512. Defense counsel made a *Wheeler*[9] challenge following the excusal of Juror No. 1512:

"[Defense counsel:] Your honor . . . this would be the fourth African-American juror that counsel has kicked off.

"The Court: It would be the fourth, according to my calculation as well. Although, go ahead. Are you saying that [the prosecutor] is systematically excluding African-American jurors?

"[Defense counsel:] Yes. I note this prospective juror has indicated that she could be fair and impartial as well as the marketing coordinator has answered every question she would be a fair juror. The male black from Compton has indicated that he could be a fair juror. Didn't answer any questions --

"The Court: That would be the one that said that the police officer wrongly arrested the person involved in his case.

"[Defense counsel]: Well, but, well, he did dismiss the case. So, I mean, does have a reason to indicate that the case was dismissed prior to even being submitted to the jury. But, he also indicated that he believes that the police could use ruses. That he didn't find a problem with that as long as trying to get at truth. He also indicated that.

"The Court: Okay.

---

[9] A state challenge under *Wheeler* is construed as a federal constitutional claim under *Batson* as well. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

"[Defense counsel]: There's no reason that I can think of that [the prosecutor] is kicking these witnesses off, prospective jurors off, other than the fact that they're African-American.

"The Court: Alright. [¶] [Prosecutor], do you wish to respond?

"[Prosecutor]: Let me start with the -- I might be wrong on the numbers, but the Juror No. 6, I believe is 1512, she is young. She is an English student. She talked about when I asked her specifically can she make a decision with one witness and she clearly stated she would want more evidence than that.[10] And based on that, her youth and her likely inability to convict if I only have one complaining victim, I can use my peremptory challenge on her.

"The Court: Alright.

"[Prosecutor]: As for the male from Compton I believe that's No. 0479. He talked about how someone was wrongly tried and used the word convict, wrongly convicted. When I inquired, unclear whether or not he misused the concept of wrongly convicted. Shows a bias against the police. That they arrested a man and shouldn't have. For those reasons I kicked him off.

"The Court: And he also indicated he is not being paid to be here. We had some discussion with challenge for cause based on hardship.

"[Prosecutor]: All right. In addition to that the fashion merchandise student. This is a woman that was slow in answering either the court's questions or my questions. She talked about how she also had trouble with if I only call one witness and she had showing of bias as to that. Specifically, asked her even if I call one witness would you be able to convict she said no. She's sitting there closing her hand in front of her.

---

[10] The prosecutor was incorrect that Juror No. 1512 stated she wanted more evidence than one witness's testimony to convict. Juror No. 1512 expressed that if presented with two versions of events, she would conclude there was reasonable doubt concerning defendant's guilt.

11

"In addition to that, she had trouble with the idea of police officers creating a ruse. That was the reason I chose to exercise my peremptory challenge.[11]

"As far as the other juror, I believe, No. 9705, she was, I specifically asked her if she would require more evidence or more than one witness and she said that she wants more. She also indicated that she did not think that it was fair, or at least that was [the] impression I got, if I only call one witness, that would be enough to convict. And I'll submit on that.

"The Court: All right. [¶] [Defense counsel], do you wish to respond?

"[Defense counsel]: No.

"The Court: I will also note for the record because the record does not indicate that Juror No. 12 is African-American juror. No. 11 is African-American. Juror No. 7 is African-American.

"I am finding based upon the representations that were made and my own observations that there has not been a systematic exclusion of African Americans and the *Wheeler Batson* challenge is denied."

**The *Wheeler/Batson* Rule**

The *Wheeler* court held that a prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group membership violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) *Batson* held, among other things, that such a practice violates a defendant's right to equal protection of the laws under the United States Constitution's Fourteenth Amendment. (*Batson*, *supra*, 476 U.S. at pp. 97-98.) The *Wheeler/Batson* principles

---

[11] The prosecutor was incorrect that Juror No. 3539 expressed hesitation about police using a ruse to obtain information. The prospective juror who was seated as Juror No. 15 just prior to Juror No. 3539 indicated that the use of a ruse would be problematic. The prosecutor also used a peremptory challenge to excuse that juror from the jury.

apply to peremptory challenges excusing jurors improperly on the basis of race, gender, or ethnic grounds.  (*United States v. Martinez-Salazar* (2000) 528 U.S. 304, 315; *People v. Willis* (2002) 27 Cal.4th 811, 813-814.)

The three-step standard for reviewing a *Wheeler/Batson* motion is well established:  "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613.)

To make a prima facie showing as required in step one, the defendant must demonstrate "that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  (*Batson*, *supra*, 476 U.S. at pp. 93-94.)  "[P]roof of a prima facie case may be made from any information in the record available to the trial court, [but there are] 'certain types of evidence that will be relevant for this purpose.  Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group.  He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.  Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' [Citations.]"  (*People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*).)

13

**Analysis**

Defendant argues that it is unclear whether the trial court found that he failed to make a prima facie case that the prosecution exercised peremptory challenges on the basis of race under the first stage of the analysis, or failed to prove purposeful discrimination under the third stage, but that in either case the "systematic exclusion" standard the trial court employed was incorrect and placed too great a burden on the defense. We agree with the Attorney General that the trial court used the phrase "systematic exclusion" to express its finding that defendant had failed to make a prima facie showing that the challenges were race-based in the first stage, rather than to articulate a more stringent standard than required.

"'In determining whether to infer a trial court finding of a prima facie case under *Wheeler*, we look to the whole record, examining the court's remarks in context.' (*People v. Hayes* (1990) 52 Cal.3d 577, 605, fn. 2.)" (*People v. Taylor* (2010) 48 Cal.4th 574, 612-613 (*Taylor*).) "It is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties. [Citations.] [¶] Absent evidence to the contrary, that presumption justifies a finding in this case that the trial court" properly applied the standard. (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032.)

We are satisfied that the trial court engaged in a step one analysis and employed the proper standard. Our Supreme Court has held a trial court's statement that there has been no "systematic exclusion" of a cognizable group is "fairly understood as a finding that defendant failed to put forth sufficient evidence from which discrimination could be inferred." (*Taylor*, *supra*, 48 Cal.4th at p. 642; see *People v. Bonilla* (2007) 41 Cal.4th 313, 342 (*Bonilla*).) In doing so, it has explained that "'the ultimate issue to be addressed on a *Wheeler-Batson* motion "is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." [Citation.] But in drawing an inference of discrimination from the fact one

14

party has excused "most or all" members of a cognizable group'—as [the defendant] asks the court to do here—'a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.]" (*Bonilla*, *supra*, at p. 343, fn. 12.) The Supreme Court has "recognized that, although the term 'systematic exclusion' is more appropriate to a claim of underrepresentation in the jury venire, courts sometimes use the term 'to describe a discriminatory use of peremptory challenges.' [Citations.]" (*Taylor*, *supra*, at p. 642.)

The context in which the trial court's ruling was made supports the conclusion that it ruled defendant failed to make a prima facie showing of purposeful discrimination. Defendant is not African-American, and did not argue that the majority of the remaining jurors were the same race as the victim. He did not argue that the excused jurors shared only the single characteristic that they were black and were otherwise as heterogeneous as the community as a whole. Nor did defendant claim that the prosecution engaged in desultory voir dire. The record indicates the opposite. The excused jurors were questioned thoroughly by the prosecution, and information elicited in voir dire showed that there were race-neutral reasons for excusing each of the jurors. Juror No. 3539 was a young woman with limited life experience, who expressed concern about basing a conviction on the testimony of a single credible witness. (See *People v. Cruz* (2008) 44 Cal.4th 636, 657-658 [age and lack of life experience are valid, nondiscriminatory reasons for exercising a peremptory challenge].) Juror No. 1512 was also young and inexperienced and stated that she believed reasonable doubt arose when two parties presented differing versions of events. (See *Ibid*.) Juror No. 9705 stated that she would "want more" than the testimony of a single credible witness to convict. Juror No. 0479 told the judge that it would be a hardship for him to serve because his work would not pay him for jury service and he was the only person working in his household. Three African-American jurors remained on the jury following the prosecution's 10th and final challenge. The prosecution had previously accepted the jury as constituted when two of the African-American jurors it later struck were still seated. At that point, there were five

seated jurors who were African-American. No additional African-American jurors were included in the jury as a result of the defendant's subsequent peremptory challenges, indicating that race was not the motivating factor for the prosecution's exercise of challenges.[12] Absent any other obvious basis for the *Wheeler/Batson* challenge, the trial court asked defense counsel if his objection was based on systematic exclusion, to which counsel replied, "Yes." It is only logical to infer that the court ruled defendant failed to meet his burden at the first stage when it stated that it found no "systematic exclusion."

The trial court invited the prosecution to give its reasons, which may indicate that a prima facie showing has been made in some circumstances. However, "a trial court's request that the prosecutor provide reasons for his or her exercise of a peremptory challenge is not an implicit finding the defendant has established a prima facie case . . . ." (*Taylor*, *supra*, 48 Cal.4th at p. 612.) It is "the better practice" for courts to request that the prosecution make a record of its race-neutral reasons for excusing prospective jurors even when finding no prima facie showing has been made. (*Id.* at pp. 613-614, fn. 9.) Such information assists the trial court in evaluating the challenge and the reviewing court in assessing the ruling on appeal. (*Bonilla*, *supra*, 41 Cal.4th at p. 343, fn. 13.) Here, the court did not make factual findings regarding any of the stated reasons, and denied the motion with minimal comment, which indicates that it was not making a stage

---

[12] In *People v. Johnson* (1989) 47 Cal.3d 1194, 1220, our Supreme Court explained, "Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge. In addition, the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain."

16

three analysis. (See, e.g., *Taylor*, *supra*, at pp. 613-614 [court's failure to explain its ruling in depth indicated "it never intended to undertake a third-stage analysis"].)

Finally, even if the standard applied was ambiguous, "[w]here it is unclear whether the trial court applied the correct standard, we review the record independently to 'apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror' on a prohibited discriminatory basis. [Citations.]" (*Bell*, *supra*, 40 Cal.4th at p. 597.) In view of the totality of the relevant facts discussed above, we cannot conclude that the record supports such an inference.

### *Duty to Instruct on Child Sexual Abuse Accommodation Syndrome*

Defendant next contends the trial court erred in failing to give a limiting instruction on the expert witness's testimony regarding CSAAS. In the alternative, he asserts that trial counsel was ineffective for failing to request such an instruction.

Expert testimony about CSAAS "is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. However, . . . such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse." (*People v. Stark* (1989) 213 Cal.App.3d 107, 116 (*Stark*).) Defendant makes no argument that evidence of CSAAS was improperly admitted in this case; instead, he focuses on the absence of a limiting instruction on the use of the expert's testimony.

#### Proceedings

Clinical psychologist Dr. Jayme Jones testified on behalf of the prosecution regarding CSAAS. The prosecution had not presented expert witness testimony

17

regarding CSAAS in defendant's first trial. Dr. Jones explained that CSAAS is a model for understanding the behavior of children who have been sexually abused. It dispels the myths that children in abuse situations fight back and immediately disclose the abuse. The model has five components: secrecy, helplessness, accommodation, disclosure, and recantation. Child abuse generally occurs in secrecy, signaling to the child that they are not suppose to disclose what has happened. Although there may be other individuals in the area at the time of the abuse, there will often not be others watching. Children do not fight their victimizers in many cases because they are physically weaker and have been socially conditioned not to say "no" to adults. Children adopt mechanisms to cope with the trauma. If the abuser is a family member, it is not unusual for the child to continue to show the abuser affection. It is also not uncommon for the victim to return to the home where the abuser is living even after the victim becomes an adolescent or adult. Most children delay disclosure if they disclose at all. Disclosure will often occur during an argument or in another volatile situation, when the victim feels something unfair has happened. Children may disclose when their parents deny them privileges, which causes them to be disbelieved. When the victim does disclose, there can be problems with memory, and details may merge together. Victims may recant their version of events in order to avoid talking about the abuse, or suffering other negative consequences of disclosure, such as familial disapproval or removal from the home.

The prosecutor questioned Dr. Jones regarding her familiarity with this case and regarding CSAAS's ability to predict whether abuse has occurred:

"Q: Now, have you yourself interviewed anybody related to this case or read any sort of reports related to this case at all?

"A: I have not.

"Q: And have you done any studies or done any sort of clinical evaluations of anyone related to this case?

"A: No.

18

"Q: Now does this model necessarily predict one way or the other whether someone was, in fact, sexually abused?

"A: Not at all. And one of the things [the doctor who authored CSAAS] later published was a paper basically stating he wished he hadn't called it a syndrome. Because 'syndrome' makes it sound like it is predictive, and it's not. It doesn't tell us whether or not a child has been abused. It simply explains their behavior if they have been abused."

Defense counsel did not request a limiting instruction with respect to the permissible uses of the CSAAS testimony. The trial court instructed the jury with CALCRIM No. 332[13] that it could give the expert's testimony whatever weight it felt appropriate. The court gave no other instructions regarding expert testimony.

**Standard of Review**

We review independently the question of whether the trial court has a duty to give a particular jury instruction. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) "'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's

_____

[13] CALCRIM No. 332 reads in pertinent part as follows: "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

19

understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)" (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.)

### Sua Sponte Duty to Provide Limiting Instructions

As a general matter, the Legislature has determined that limiting instructions need not be given sua sponte. "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355, italics added.) Our Supreme Court has consistently applied the concept set forth in Evidence Code section 355. "'Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted.' (*People v. Cowan* (2010) 50 Cal.4th 401, 479.)" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052 [no sua sponte duty to instruct on limited use of gang evidence]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5 (*Humphrey*) [clarifying instruction on use of evidence of battered women's syndrome might be appropriate *on request*]; *People v. Collie* (1981) 30 Cal.3d 43, 63 [limited purpose of prior criminal acts does not require sua sponte limiting instruction]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316-1317 [no duty to give limiting instruction regarding evidence of other acts of domestic violence committed by defendant].)[14]

As pertinent here, the Legislature has determined that only one instruction need be given sua sponte on expert testimony. "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury

---

[14] "There is a 'possible' narrow exception in the '"occasional extraordinary case"' in which the evidence '"is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose."' (*People v. Hernandez*[, *supra*,] 33 Cal.4th [at pp.] 1051-1052, quoting *People v. Collie*[, *supra*,] 30 Cal.3d [at pp.] 63-64.)" (*People v. Murtishaw*, *supra*, 51 Cal.4th at p. 590.)

substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] *No further instruction on the subject of opinion evidence need be given.*" (§ 1127b, italics added.)

The trial court complied with its obligation to instruct pursuant to the requirements of section 1127b by providing the jury with the pattern instruction on expert testimony found in CALCRIM No. 332. Under the plain language of the final sentence of section 1127b, no further limiting instruction on the use of CSAAS was required.

Despite the plain language of section 1127b and Evidence Code section 355, defendant argues that *People v. Housley* (1992) 6 Cal.App.4th 947, 957 (*Housley*) imposes a sua sponte duty on the trial court to instruct the jury on the use of expert testimony on CSAAS. The principles are set forth in CALCRIM No. 1193, which states: "You have heard testimony from _____*<insert name of expert>* regarding child sexual abuse accommodation syndrome. [¶] _____'s *<insert name of expert>* testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not _____'s *<insert name of alleged victim of abuse>* conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The *Housley* court concluded "that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be

21

instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at pp. 958-959.)

In the lone decision arguably consistent with *Housley*, Division One of the Court of Appeal, Fourth Appellate District concluded that when an expert testifies to CSAAS, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).) Whether the *Bowker* court intended to hold that the limiting instruction must be given sua sponte is unclear, as the opinion does not expressly discuss the point. Any doubt as to the intent of the *Bowker* court has been eliminated, because the same court that decided *Bowker* held in three subsequent cases that the limiting instruction must be given "if requested." (*Stark*, *supra*, 213 Cal.App.3d at p. 116; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 (*Sanchez*), overruled on other grounds in *People v. Jones* (1990) 51 Cal.3d 294, 307; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587-588 (*Bothuel*), disapproved on another point in *People v. Scott* (1994) 9 Cal.4th 331, 347-348.) We are confident that *Stark*, *Sanchez*, and *Bothuel* accurately describe the intention of the decision in *Bowker*.

Defendant's contention, and the holding in *Housley*, are at odds with our Supreme Court's decision in *Humphrey*, *supra*, 13 Cal.4th 1073. Throughout its opinion in *Humphrey*, the court repeatedly referred to the trial court's duty to give a limiting instruction on the use of battered women's syndrome evidence on request. (*Id.* at p. 1088, fn. 5, pp. 1090-1091 (conc. opn. of Baxter, J.), and p. 1100 (conc. opn. of Brown, J.).) The majority opinion in *Humphrey* does not require a sua sponte limiting instruction on the use of evidence of battered women's syndrome, it suggests that an instruction would be discretionary on request: "If the prosecution offers the battered women's syndrome evidence, an additional limiting instruction *might* also be appropriate on

22

request, given the statutory prohibition against use of this evidence 'to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.' (Evid. Code, § 1107, subd. (a); see CALJIC No. 9.35.01 (1996 new)(5th ed. Supp.).)" (*Id.* at p. 1088, fn. 5, italics added.) Battered women's syndrome is analogous to CSAAS. Both syndromes explain that victims' "seemingly self-impeaching" behaviors—e.g., delayed disclosure, returning to the home—are consistent with their claims of having been beaten, raped, or sexually molested. (See *People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301.) We can think of no reason why a duty to instruct should be imposed in one situation and not the other.

Based upon statutory and decisional law, we respectfully disagree with *Housley*'s holding that a limiting instruction is required sua sponte in all cases involving expert testimony on CSAAS. The instruction need only be given if requested.

**Harmless Error**

Assuming the trial court erred in failing to sua sponte instruct the jury on the limited use of CSAAS evidence, any error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Bowker*, *supra*, 203 Cal.App.3d at p. 395; *Housley*, *supra*, 6 Cal.App.4th at p. 959.) Defendant cannot establish a reasonable probability of a more favorable verdict if a limiting instruction had been given. Where, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence. (See *Stark*, *supra*, 213 Cal.App.3d at pp. 115-116; *Housley*, *supra*, at p. 959.) Dr. Jones clearly stated that she had not interviewed or evaluated anyone involved in the case, and that CSAAS was not intended to predict whether a child had suffered abuse. The trial court instructed the jury that in considering expert testimony, it "must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning

23

and importance of any opinion are for you to decide . . . You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.)

The prosecution presented a solid case against defendant. I.T. testified to her version of events consistently and in detail when speaking with detectives and when testifying at the preliminary hearing and trial. Defendant admitted to officers that he had sexual relations with her on multiple occasions. Although defendant suggests his confession was gained through "trickery," he does not separately contend that his statements were involuntary. "We note that the '"mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent [statement or admission] involuntary." [Citation.]'" (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1484.) The officers urged defendant to be truthful to help I.T. He was not promised leniency or any other benefit.

The witnesses who testified on defendant's behalf said little to refute I.T.'s account of the incidents, nor could they, considering that according to both I.T. and defendant, there were no witnesses. At most, the defense witnesses suggested an alibi for a molestation that occurred on Halloween and another on the day of a trip to Knott's Berry Farm, but those were only two of many incidents for which there was no refutation. With respect to I.T.'s motive to separate her mother from defendant, the jury could reasonably believe her animus arose from the molestation and I.T.'s fear for her young sister, because she disclosed what had happened during an argument over defendant's treatment of her sister.

Defendant argues that prejudice is established by the fact that the first jury, which did not hear evidence on CSAAS, was hung nine to three in his favor. He reasons that the CSAAS evidence tipped the balance in favor of the prosecution in his second trial. Defendant's speculation on this point does not establish prejudice, because he does not

24

contend that the CSAAS evidence was improperly admitted. Even if a limiting instruction had been given, the jury would have heard the same evidence, which provided a reasonable explanation for I.T.'s seemingly inconsistent behavior.

We reject defendant's argument that the length of deliberations and the fact that the jury requested readback of testimony establishes that his case was close, and that he was prejudiced by lack of instruction. Defendant does not quantify the time the jury spent in deliberations, but by our calculations it was approximately six and a half hours, including readback of testimony. Juries sometimes return a verdict quickly in close cases, and other times engage in extended deliberations in cases with overwhelming proof of guilt. Here we find no correlation between the length of deliberations and the strength or weakness of the prosecution's case. Consistent with making a careful decision, "we assume that the jury spent time going over their instructions to make sure that they were properly carrying out their duties." (*People v. Walker* (1995) 31 Cal.App.4th 432, 438.) "[W]e find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Id*. at p. 439.) The jury approached its task with care, requesting a rereading of very specific testimony. The length of deliberations established no more than that the jury took its time to reach a verdict in a case with significant ramifications.

Defendant does not contend the prosecution used the CSAAS testimony in an improper fashion in argument to the jury. We are satisfied that CALCRIM No. 1193, had it been given, would not have added to what the jury already understood. Prejudice has not been shown.

**Ineffective Assistance of Counsel**

Defendant alternately contends counsel was ineffective in failing to request a limiting instruction. "To establish ineffective assistance, defendant bears the burden of

25

showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 940, abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110.) "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation. [Citations.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Because the record sheds no light on why counsel did not request CALCRIM No. 1193, we cannot reach the merits of the claim of ineffective assistance of counsel. And on the record presented, there is no basis to conclude counsel's performance was deficient. As a tactical matter, competent counsel could rationally conclude that it would be counterproductive to request an instruction highlighting expert testimony supporting the victim's credibility. "A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394.) Moreover, in light of our conclusion that any error was harmless, defendant cannot show he was prejudiced by counsel's purported error. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217 [defendant must establish prejudice to obtain relief on an ineffective assistance claim].)

### *Lewd or Lascivious Act Instruction*

Defendant contends that the trial court had a duty to sua sponte instruct the jury on the crime of lewd or lascivious act on a child under the age of 14 (§ 288). He argues that section 288 describes a lesser included offense of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)) under the accusatory pleadings test. In the alternative, he asserts that counsel was ineffective for failing to request the instruction.

26

The Attorney General responds that any error was invited, and defendant forfeited his claims by rejecting instructions on lesser included offenses. The Attorney General further argues section 288 is not a lesser included offense of section 288.5 under either of the relevant tests, and that defendant cannot establish the necessary prejudice to support his claim of ineffective assistance of counsel.

We need not address the Attorney General's forfeiture contention, because we agree (1) the court had no obligation to instruct on section 288 under the accusatory pleadings test, and (2) defendant cannot establish ineffective assistance of counsel.

**The Accusatory Pleadings Test**

"'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]'" (*People v. Licas* (2007) 41 Cal.4th 362, 366.) "'"[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]" [Citation.]'" (*Ibid.*)

Section 288.5, subdivision (a) provides: "Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years."

Pursuant to section 288, subdivision (a): "[A]ny person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

We have held that because section 288 requires the specific intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the defendant or the victim, whereas section 288.5 does not, section 288 does not constitute a lesser included offense of section 288.5 under the statutory elements test. (*People v. Palmer* (2001) 86 Cal.App.4th 440, 444-445; see *People v. Avina* (1993) 14 Cal.App.4th 1303, 1313-1314.) Defendant concedes the point, and instead argues that the language of the felony information necessitated that lewd and lascivious act upon a child be committed for a guilty verdict of continuous sexual abuse of a child. We reject the contention.

Count 1 of the information charged: "On or between March 13, 2002 and March 12, 2006, in the County of Los Angeles, the crime of CONTINUOUS SEXUAL ABUSE, in violation of PENAL CODE SECTION 288.5(a), a Felony, was committed by LUIS MIGUEL MATEO, who did unlawfully engage in three and more acts of 'substantial sexual conduct', as defined in Penal Code Section 1203.066(b), *and* three and more lewd and lascivious acts, as defined in Penal Code Section 288, with [I.T.], a child under the age of 14 years, while the defendant resided with, and had recurring access to, the child." (Italics added.)

Defendant's argument is based upon the fact that the charging document is phrased in the conjunctive, which he interprets as requiring both three acts of "substantial sexual conduct" and three lewd and lascivious acts. But "'[w]hen a crime can be committed in more than one way, it is standard practice to allege in the conjunctive that it was committed every way. Such allegations do not require the prosecutor to prove that the defendant committed the crime in more than one way. [Citation.]'" (*People v.*

28

*Moussabeck* (2007) 157 Cal.App.4th 975, 981.)  Here, the language of the charging document follows the statute in all other particulars.  "In such cases only the statutory elements test is relevant in determining if an uncharged crime is a lesser included offense of that charged.  [Citations.]"  (*Ibid.* [holding only statutory elements test applied where language in the information tracked statutory language, although phrased in the conjunctive].)  Because defendant's claim fails under the statutory elements test, it necessarily fails under the accusatory pleading test as well.

### Ineffective Assistance of Counsel

Defendant's argument that his counsel rendered ineffective assistance also fails.  There is no explanation of counsel's choice in the record, and, as we have discussed, defendant cannot establish prejudice because section 288 is not a lesser included offense of section 288.5 under the accusatory pleading in this case.

### *Cumulative Error*

Finally, defendant contends the combination of alleged errors addressed above resulted in a miscarriage of justice and rendered his trial fundamentally unfair.  Having rejected each of his appellate challenges, we are compelled to find no merit to this contention.  This was not a case in which trial errors that were nonprejudicial singularly, combined to deprive defendant of due process or a fair trial.  (See *People v. Box* (2000) 23 Cal.4th 1153, 1219.)

29

## DISPOSITION

The judgment is affirmed.


KRIEGLER, J.

We concur:


MOSK, Acting P. J.


BAKER, J.